NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PATHFINDER, L.L.C., | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 04-1475 |
| | : | |
| BARTON L. LUCK, | : | |
| Defendant, | : | **OPINION** |
| | : | |
| v. | : | |
| | : | |
| LOUIS J. CABANO and LJC Holdings, | : | |
| Third Party Defendants. | : | |

This matter has come before the Court on Defendant Barton Luck's ("Luck")

Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 to dismiss the claims of

Plaintiff, Pathfinder L.L.C. ("Pathfinder").  For the reasons discussed herein, Luck's

Motion for Summary Judgment will be granted in-part and denied in-part.

## I.  Factual Background

Pathfinder is a New Jersey firm that provides capital plant project management and

consulting services to businesses around the world who are engaged in the chemical

process industry.  (Opp. Br. at 2.)  Pathfinder was founded in 1975 by Louis Cabano

("Cabano") and his wife.  (Id.)  Luck, a citizen of Idaho, began his employment with

Pathfinder in 1978 as a principle associate.  (Id. at 3.)  From 1978 to 2003, Luck was

promoted to vice president of construction, to senior vice president, and was serving as an

executive vice president when Luck left Pathfinder.  (Id.)

On December 3, 1998, Cabano offered Luck, and three other employees, the opportunity to become a "Member" by presenting him an Operating Agreement.  (Id.) The Operating Agreement allowed Luck, and other "Class B" Members, an opportunity to progressively obtain an ownership interest for the buy-in price of one dollar.  (Pathfinder, Exh. H at Section 17.2.)  After ten (10) years, the Operating Agreement permitted Luck to obtain up to a 42% ownership stake in Pathfinder.  (Id.)  Today, Pathfinder is allegedly worth between 3 to 6 million dollars.  (Pathfinder Br. at 7.)  In Section 6, the Operating Agreement also provided for a capital account, and according to Louis Cabano, Members were permitted,  at his or her risk, to deposit money into this account with the hope that it would grow in value as Pathfinder made more money.  (See id.)  Luck testified that he was provided with an Operating Agreement, and he retained an attorney to review the document.  (See Pathfinder, Exh. B, at 31-32.)  The Operating Agreement appears to have been fully reviewed, negotiated, and revised by the parties and their respective attorneys. Thus, in exchange for prospective ownership rights and the opportunity to participate in the capital account, Members were required to agree to certain covenants.

On January 1, 2000, LJC Holdings and Luck executed the Operating Agreement, which included a "Duty of "Members" clause and a restrictive covenant clause.  In Section 10.1 of the Operating Agreement, it was stated:

> Each Member of the Company has a duty of loyalty, fair dealing and good faith with respect to all Company matters.  An act or omission in breach of a Member's duty of loyalty, fair dealing and good-faith means any act or omission which the member knows or believes to be contrary to the best

2

interests of the Company or its Members in connection with a matter in which the Member has a material conflict of interest.

(See id., Exh. H.)

The restrictive covenant clause was broken down to into two periods of employment.  (See id.)  First, section 14.2 covered the period if Luck was terminated from employment *before* January 1, 2005.  The second period, section 14.3, concerns an employment termination *after* December 31, 2004; that is, after the five (5) year mark when a Member was entitled to redeem his shares.  (Id. at Section 14.3.)

On January 27, 2003, Pathfinder and an one of its clients, AB Mazeikiu Nafta, executed a General Contract for Advisory Services (the "Contract") for consulting work in Lithuania.  (See Pathfinder, Exh. L.)  The Contract was silent as to the duration.  (See id.)  Louis Cabano testified that it was able to obtain this contract due to the 12 to 14 year relationship Luck had cultivated with P. Nelson English ("English") at AB Mazeikiu Nafta.  (Pathfinder Br. at 12.)  Allegedly, as early as January 2003, English and Luck began discussing Luck's direct employment with AB Mazeikiu Nafta.  (Id. at 13.)  Midway in 2003, Pathfinder approached AB Mazeikiu Nafta because the Contract had not generated the anticipated levels of revenue; consequently, the relationship appeared to deteriorate between the two companies.  In September 2003, AB Mazeikiu Nafta sent Luck a "Letter of Understanding," regarding a proposal of employment with the firm.  (See Pathfinder, Exh. N.)  On November 22, 2003, Cabano alleges that Luck advised him that he was considering an employment opportunity with AB Mazeikiu Nafta.  (Id. at 16.)

3

In a letter dated January 13, 2004, Luck resigned from Pathfinder.  (Pathfinder, Exh. O.)  The next day, Luck and AB Mazeikiu Nafta entered into an employment contract, and on February 4, 2004, Yukos International UK B.V., the majority shareholder of AB Mazeikiu Nafta, entered into an Employment Agreement with Luck.  (Id., Exh. P.)

It is undisputed that the Operating Agreement's Section 14.2, is implicated here because Luck's employment was terminated before January 1, 2005.  Section 14.2 states:

> 14.2  In the event of termination of employment or memberships before January 1, 2005, each Member further covenants and agrees that he or she shall not:
> 14.2.1  Seek, encourage and/or accept direct or indirect employment *with a client* of the Company for a period of one (1) year following the termination of employment or membership with the Company.

(Pathfinder, Exh. H.) (emphasis added).  The second time period appears more restrictive, and the testimony from Cabano supports that conclusion because he indicates that once a Member served five (5) years he could redeem the value of his units.  (Luck Br. at 18.)  Therefore, section 14.3 applied to "any past or present customers or clients," and states:

> The term "customers or clients" as defined in this Agreement shall include all persons or entities for whom the Company has ever solicited and/or performed any sales or services, as well as their agents, employees and representatives, any of whom have had contact with or do business with the Company.

(Id.)  Notably, in section 31 of the Operating Agreement, it stated, "Whenever from the sense or context of this Agreement it appears required or appropriate, each term stated in either the singular or plural shall include both singular and plural . . ."  (Pathfinder, Exh. H.)

4

## II.  Standard for Summary Judgment

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (c).  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's

Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly

supported motion for summary judgment, the nonmoving party must identify specific

facts and affirmative evidence that contradict those offered by the moving party.

Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations,

general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l

Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro,

Inc., 934 F.2d 497, 500 (3d Cir. 1991)).

Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment,
> after adequate time for discovery and upon motion, against a party who fails
> to make a showing sufficient to establish the existence of an element
> essential to that party's case, and on which that party will bear the burden of
> proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role

is not to evaluate the evidence and decide the truth of the matter, but to determine

whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

249 (1986). Credibility determinations are the province of the fact finder. Big Apple

BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### III.  Analysis

The Court must apply the forum state's choice of law rule. General Star Nat. Ins.

Co. v. Liberty Mut. Ins. Co., 960 F.2d 377, 379 (3d Cir. 1992) (citation omitted). With

respect to contract disputes such as this, the New Jersey Supreme Court has held that "the law of the place of the contract will govern the determination of the rights and liabilities of the parties." State Farm Mut. Auto. Ins. Co. v. Simmons Estate, 417 A.2d 488 (N.J. 1980).

Pathfinder's Complaint alleges six (6) Counts: Count I: breach of contract, as it regards the restrictive covenant in the Operating Agreement; Count II: breach of contact, as it regards damages, costs, and fees resulting from the breach of the restrictive covenant; Count III: unjust enrichment; Count IV: breach of the duty of loyalty; Count V: usurping a corporate opportunity; and Count VI- tortious interference with a prospective business relationship.  Luck urges the Court to dismiss all of Pathfinder's claims because (1) Luck's employment with AB Mazeikiu Nafta does not violate the terms of the restrictive covenant; (2) the Operating Agreement is void under the doctrine of mutual mistake; (3) the restrictive covenant is unenforceable under New Jersey law; (4) Pathfinder does not have a cognizable claim of unjust enrichment; (5) Pathfinder fails to support is claims of breach of fiduciary duty an/or the duty of loyalty; and, (6) Pathfinder does not sufficiently set forth a tortious interference with a business relationship claim. Luck has filed counterclaims against Louis Cabano and LJC Holdings; yet, Luck has not moved for summary judgment on those claims.

    **A.**    **Violation of the Restrictive Covenant**

First, Luck argues that the restriction in Section 14.2 is limited to an active client for a period of one year following termination.  (See Pathfinder, Exh. H.)  Because AB Mazeikiu Nafta was not a "client" when he accepted employment with them, Luck argues that he did not violate section 14.2 in the Operating Agreement.  Moreover, Luck asserts that unlike section 14.3, there is no reference to "past customers or clients" in section 14.2.  (Luck Br. at 17-18.)  Conversely, Pathfinder asserts that when Luck left the firm, AB Mazeikiu Nafta was still a client because Pathfinder was still billing it for work it had performed.  (Pathfinder Br. at 21.)  Additionally, Pathfinder argues that whether AB Mazeikiu Nafta was a "client" or not under section 14.2 is irrelevant since the restrictive covenant barred him from accepting employment with *any* client (past or current) for a one year period.  (Id.)  The critical question, then is whether AB Mazeikiu Nafta is "a client" under section 14.2, and whether that distinction is relevant under the restrictive covenant.

Contrary to Pathfinder's argument, the distinction is between a "client" in section 14.2 and "any past or present customers or clients" in 14.3 is telling.  Further, in section 14.3.1 it states:

> The term "customers or clients" as defined in this Agreement shall include all persons or entities for whom the Company has ever solicited and/or performed any sales or services, as well as their agents, employees and representatives, any of whom have had contact with or do business with the Company.

(Pathfinder, Exh. H.)  Had Pathfinder meant to include this more expansive client definition in 14.2, it would have.  Nor do the plurality provisions of section 31 change the result because it is not the number of clients that is at issue, but rather their status when Luck left Pathfinder.  Moreover, logic concurs with the notion that there be a more elaborate definition of "client" in the time period when Members could redeem their units and assume ownership rights in Pathfinder.  Lastly, and in agreement with Luck, any ambiguity here must be construed against Pathfinder, the drafter of the Operating Agreement.  (See Luck Br. at 19-18.)  Therefore, the "client" in section 14.2 is relegated to current or active clients.

Nevertheless, Luck's argument fails because AB Mazeikiu Nafta was a "client" to Pathfinder in the period described as "one year following termination."  Pathfinder states although services ended in December 2003, "AB Mazeikiu Nafta was very much an active file of Pathfinder's in 2004."  (Opp. Br. at 18.)  There was testimony by Cabano, that Pathfinder intended to do capital work for AB Mazeikiu Nafta in 2004, and lost that opportunity when Luck "defected."  (Pathfinder, Exh. A at 84-85.)  Conversely, Luck relies on the testimony of Louis Cabano, which admittedly indicates that AB Mazeikiu Nafta was no longer an active client in December 2003.  (Reply at 11-12 citing Pathfinder's SMF ¶ 61.)

While the mere expectation for future work from a former client is not conclusive in whether a client is active, drawing all favorable inference in favor of Pathfinder,

coupled with recognition that a consulting client relationship is more fluid then other types of client relationships, Luck's argument must be rejected at the summary judgment stage. This conclusion is further buttressed by the two letters, dated January 27, 2004 and February 25, 2004, see Pathfinder, Exh. Q, in which Pathfinder sought to collect open invoices from AB Mazeikiu Nafta; this indicates the existence of a continued business relationship between Pathfinder and AB Mazeikiu Nafta. This interpretation does not contort the commonly understood meaning of client. Despite Luck's argument to the contrary, Pathfinder's assertion that it was going to pursue additional work with AB Mazeikiu Nafta in 2004 has sustenance since AB Mazeikiu Nafta still required consulting services in 2004, as evidenced by Luck executing an employment contract to provide these very services. Consequently, Pathfinder has identified specific facts and affirmative evidence that contradict those offered by Luck. See Andersen, 477 U.S. at 256-57.

As such, it would be improper to hold, as a matter of law, that AB Mazeikiu Nafta was not a client and that Luck's employment was not violative of the Operating Agreement. Needless to say, no determination is made as to the viability of Pathfinder's claims. Rather, the conclusion is that Luck has not met its burden for summary judgment under this argument.

**B.     Mutual Mistake**

Luck argues that the Operating Agreement is void under the doctrine of mutual mistake. It is generally understood that a mistake is mutual and justifies reformation of

10

an instrument when mistake is common to all parties to a transaction and all labor under the same misconception of fact.  Biliunas v. Balassaitis, 171 A. 319 (N.J. Ch. 1934). Luck asserts that because none of the parties could have anticipated the dire financial condition of the company in 2003, which allegedly caused the Operating Agreement to result in a financial detriment to Luck, the Operating Agreement is void pursuant to the mutual mistake doctrine.  (Luck. Br. at 20.)  Pathfinder argues that doctrine of mutual mistake is inapplicable.

The doctrine of mutual mistake does not apply for two reasons.  First, "the erroneous belief must relate to the facts as they exist *at the time of the making* of the contract."  Restatement (Second) of Contracts § 151, comment a (1981) (emphasis added).  Simply stated, the alleged dire financial condition of Pathfinder in 2003 does not relate to the facts as they existed in January 2000, the time Luck and Pathfinder executed the Operating Agreement.  Instead, the mutual mistake doctrine was best demonstrated in the oft-cited, albeit non-precedential,  Sherwood v. Walker, 33 N.W. 919 (Mich. 1887) case where the parties contracted for the sale of a cow that they both thought was barren. Much to everyone's surprise, "Rose" turned out to be pregnant.  The court held that the contract was void because both parties had been mistaken as to an existing material fact going to the subject matter of the contract.  As the court stated, "[a] barren cow is substantially a different creature than a breeding one."  Id. at 923.

11

Had "Rose" only lived one month after the sale, unless it was otherwise agreed to, the buyer would not be able to assert a mutual mistake argument. At the time the contact was formed, presumably two experienced entities made a bargain appreciating the risk that Rose might live 1 day or 20 years. Likewise, two sophisticated entities executed the Operating Agreement, understanding full well the possibility that Pathfinder might become insolvent, sold, or encounter some other corporate malady. Naturally, if Pathfinder defaulted on its side of the bargain, there are legal and equitable remedies available to the non-breaching party. The narrow focus of the present inquiry is whether the contract failed to be formed in the first place since the doctrine concerns contract formation.

Here, the parties were not mistaken as to an existing material fact. They merely disagreed as to the interpretation of their contract. Courts are frequently called upon to interpret arguably ambiguous provisions of written contracts about which there is disagreement; a mutual mistake is not necessarily present in each of those cases.

Moreover, "[a] mutual mistake occurs when both parties are under substantially the same erroneous belief as to the facts." Farnsworth, Contracts § 9.3 (1982). The doctrine of mutual mistake applies when a "mistake was mutual in that both parties were laboring under the same misapprehension as to [a] particular, essential fact." Bonnco Petrol, Inc. v. Epstein, 560 A.2d 655 (N.J. 1989). These parties were not "laboring under the same misconception." Indeed, the parties' differing interpretations of the employment contract

12

form the basis of this litigation.  Hence, mutual mistake is not a grounds to support

Luck's motion for summary judgment.

### C.     Enforceability of Restrictive Covenant

Third, Luck argues that the restrictive covenant provisions in the Operating

Agreement is in contravention of New Jersey law.  Recently, the New Jersey Supreme

Court in <u>Cmty. Hosp. Group, Inc. v. More</u>, 869 A.2d 884 (N.J. 2005), reaffirmed the

long-standing, two-part test ,when determining whether a restrictive covenant is

enforceable.  First, the following facts are considered: (i) whether the covenant in

question protects the legitimate interests of the employer, (ii) imposes no undue hardship

on the employee, (iii) and is not injurious to the public.[1]  <u>Id.</u> at 897.  Depending upon the

results of that analysis, the restrictive covenant may be disregarded or given complete or

partial enforcement "to the extent reasonable under the circumstances."  <u>Id.</u> (citation

omitted).  Therefore, if the court finds it necessary, it might "blue pencil" inequitable

aspects of restrictive covenant.

The first prong of the test requires the Court to consider whether the covenant

protects the legitimate interests of Pathfinder.  Those legitimate interests may include

protecting Pathfinder from having its experienced consultants work for a client for a

cheaper cost than that client would be required to pay Pathfinder.  Pathfinder, like every

other employer, cannot have a legitimate business interest in restricting free-market

---

[1]  Luck's Motion was filed prior April, 5, 2005, the date <u>Cmty. Hosp.</u> was rendered.
Luck, however, incorporated the <u>Cmty. Hosp.</u> ruling in its Reply Brief.

competition.  Beyond that, additional factors should be considered in determining whether

the restrictive covenant is overbroad: its duration, the geographic limits, and the scope of

activities prohibited.  Each of those factors must be narrowly tailored to ensure the

covenant is no broader than necessary to protect the employer's interests.  Cmty. Hosp,

869 A.2d at 897.

Here, the duration of the restrictive covenant was not excessive because it

contemplated two distinct employment periods, which increased the restriction once the

Member became vested under the Operating Agreement.  Luck was, therefore, only

prohibited from working with active clients for one year.  Luck does not dispute the

enforceablity of the covenant for the lack of geographic limitation in its Brief; however,

in its Reply, it proffers that the provision is overly broad because it applies anywhere in

the world.  (See Reply at 20.)  Nevertheless, one Superior Court convincingly reasoned

that, "The failure to restrict the geographical area is not significant, since the provision

essentially sought to protect existing customer relationships rather than a territorial sphere

of influence."  Platinum Mgmt., Inc. v. Dahms, 666 A.2d 1028, 1040 (N.J. Super. Ct.

Law Div. 1995).  Here, the covenant was tailored to focus on defections to clients, not

competitors.  Indeed,

> [c]onsulting firms expend great energy and money in soliciting clients and
> developing projects for their benefit.  Each client that plaintiff is able to
> attract represents a significant investment of time, effort and money, which
> is worthy of protection.

A.T. Hudson & Co., Inc. v. Donovan, 524 A.2d 412, 434 (N.J. Super. Ct. App. Div.

1987).  Hence, because the restrictive covenant was limited to clients, for a limited

duration, it is not unreasonable merely because the geographical limits were open-ended.

The second prong requires that the restrictive covenant impose no undue hardship

on the employee.  That inquiry requires the court to determine the likelihood of the

employee finding other work in his or her field, and the burden the restriction places on

the employee.  Cmty. Hosp., 869 A.2d at 898.  In applying this part of the test, the reason

for the termination of the parties' relationship is also relevant.  Id.  If the employee

terminates the relationship, the court is less likely to find undue hardship as the employee

put himself or herself in the position of bringing the restriction into play.  Id.

Here, the second prong is satisfied.  In Cmty. Hosp., it was determined that the

doctor was a highly qualified neurosurgeon and his services were in high demand.  Most

importantly, it was observed that the doctor voluntarily resigned, and therefore, "brought

any hardship upon himself, that hardship is not an impediment to enforcement of the

restriction."  Analogous to the doctor in Cmty. Hosp., it is undisputed that Luck has

highly marketable skills, and that he voluntarily left Pathfinder.  Drawing all favorable

inferences in favor of Pathfinder, the Court will accept as true the assertion that Luck is

an "internationally recognized and valued expert in [the] Chemical Process Industry . . ."

(See Compl. ¶ 8.)  Because Luck terminated the relationship, under these facts, there will

be no finding of undue hardship as the employee put himself in the position of bringing

the restriction into play.

15

The third prong requires the Court to consider whether the restrictive covenant is injurious to the public.  In Cmty. Hosp., it was held that the impact a covenant not to compete in the medical field may have on the public is of *critical importance*.  Cmty. Hosp., 869 A.2d at 898.  (emphasis added)  In each case, the varying circumstances must be considered in the effort to evaluate the impact.  While there has been much debate concerning the scrutiny that a court should give a restrictive covenant depending on the particular profession at issue, this covenant concerns a highly-specialized, industrial field of which, unlike a doctor, the injury to the public is less a concern.  Public interest is also less affected when free-market competition is less affected; unlike, the situation in a non-compete clause where an employee is forbidden from working for a competitor, the clause here forbids going in-house with a client.  Further, Luck's Brief does not give any credence to this issue.  As such, this prong is satisfied because the restrictive covenant in the Operating Agreement, concerning consulting in the chemical process industry cannot be held to the same level of "importance" as the public's access to qualified doctors.

Based on the analysis above, Luck has failed to meet its burden to demonstrate that the restrictive covenant was unreasonable as a matter of law.  Consequently, summary judgment will be denied as to that claim.

### D.     Unjust Enrichment

To establish a claim for unjust enrichment under New Jersey law,

a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust. The unjust

enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.

Bijur Lubricating Corp. v. Devco Corp., 332 F. Supp. 2d 722 (D.N.J. 2004) (citing VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J. 1994) (citations omitted).

Pathfinder offers no legal or factual support for its unjust enrichment claim in its brief.  Pathfinder has not established that it conferred any benefit on Luck.  Additionally, because Pathfinder has a viable legal remedy, it is not necessary to ascertain the viability of an equitable remedy.  Thus, Luck's Motion is granted as to Count III.

### E.   Breach of Duty of Loyalty

Luck argues that Pathfinder has failed to offer any facts to support a claim against Luck for breach of duty of loyalty (Count IV).  In New Jersey, every employee owes a duty of loyalty to their employer.  Fields v. Thompson Printing Co., 363 F.3d 259, 270 (3d Cir. 2004) (citing Cameco, Inc. v. Gedicke, 724 A.2d 783, 789 (N.J. 1999)).  The duty of loyalty "consists of certain very basic and common sense obligations."  Id.  (citing Lamorte Burns & Co. v. Walters, 770 A.2d 1158, 1168 (N.J. 2001).  This duty usually arises in situations where an employee has assisted a competitor of the employer or engaged in self-dealing.  See Cameco, 724 A.2d at 789.  However, it is also been phrased more liberally.  "An employee must not while employed act contrary to the employer's interest."  Lamorte Burns & Co., 770 A.2d at 1168.

Duty of loyalty analysis is a fact-intensive endeavor.  The New Jersey Supreme

17

Court has explained:

> The contexts giving rise to claims of employee disloyalty are so varied that they preclude the mechanical application of abstract rules of law.  In general, the adjudication of such claims summons rules of reason and fairness.  Notwithstanding the need for flexibility when evaluating claims of employee disloyalty, certain principles emerge.

Cameco, 724 A.2d at 789.  Moreover, during the period of employment, "the employee has a duty not to compete with the employer's business."  Chernow v. Reyes, 570 A.2d 1282 (N.J. Super. Ct. App. Div. 1990).  The solicitation of customers or potential customers of an employer or comparable competitive acts constitutes a breach of an employee's duty of loyalty.  See Auxton Computer Enterprises v. Parker, 416 A.2d 952, 955 (N.J. Super. Ct. App. Div. 1980) 423-24 ("[An employee] may not solicit his [or her] employer's customers for his [or her] own benefit before he [or she] has terminated his [or her] employment.  Nor may he [or she] do other similar acts in direct competition with the employer's business."); see also Subcarrier Communications, Inc. v. Day, 691 A.2d 876 (N.J. Super. Ct. App. Div. 1997).

In sum, various considerations affect determination of the breach of an employee's duty of loyalty and the appropriate remedy for a breach, including forfeiture of the employee's compensation.  One consideration is the possible existence of contractual provisions.  See Cameco, 724 A.2d at 791.  A second consideration is whether the employer knew of or agreed to its employee's activities.  Id.  The third consideration concerns the status of the employee and his or her relationship to the employer.  An

officer, director, or key executive, for example, has a higher duty than an employee
working on a production line.  Id.  Fourth, the nature of the employee's conduct and its
effect on the employer are relevant.  Id.  An employee's duty of loyalty to an employer
generally precludes acts of direct competition.  Id.  Employees should not engage in
conduct that causes their employers to lose customers, sales, or potential sales.  Nor
should they take advantage of their employers by engaging in secret self-serving
activities, such as accepting kickbacks from suppliers or usurping their employer's
corporate opportunities.  Id.

Here, in viewing the facts in a light most favorable to Pathfinder, there exists
genuine issues of material fact that warrant denial of Luck's summary judgment motion
as to conduct constituting a breach of the duty of loyalty.  In Section 10.1 of the
Operating Agreement, it was stated:

> Each Member of the Company has a duty of loyalty, fair dealing and good
> faith with respect to all Company matters.  An act or omission in breach of
> a Member's duty of loyalty, fair dealing and good-faith means any act or
> omission which the member knows or believes to be contrary to the best
> interests of the Company or its Members in connection with a matter in
> which the Member has a material conflict of interest.

(See id., Exh. H.)  Thus, there were contractual limitations, which expressly imposed a
duty of loyalty upon Luck.  Moreover, the before-mentioned restrictive covenant forbade
Luck from being employed by an active client for one year after his termination.  Contrary
to Luck's contention that the only action that Luck initiated was *after* termination,
Pathfinder has submitted evidence that Luck was in communication with AB Mazeikiu

Nafta as early as January 2003, and then received a Letter of Understanding regarding his employment with AB Mazeikiu Nafta in September 2003.  (See Pathfinder Br. at 32-33.). Pathfinder, however, was not informed of Luck's desire to work with AB Mazeikiu Nafta until November 2003.  (Pathfinder Br. at 32-33.)  There is no suggestion that Pathfinder acquiesced in Luck's departure.  Also, it is acknowledged that mere planning to seek alternative employment is not enough to breach the duty.  See Auxton Computer Enterprises, 416 A.2d at 955 (citation omitted). Yet, as an Executive Vice President of Pathfinder and General Manager of Pathfinder's Management and Consulting Division, Luck is held to the highest duty of good faith and loyalty.  Lastly, Pathfinder has tentatively established damages; namely, that it stood to lose, by Luck's acceptance of employment with AB Mazeikiu Nafta.  Each of the above factors undermine Luck's motion for summary judgment.

Viewing Pathfinder's evidence in the most favorable light, Pathfinder has adduced sufficient evidence to survive Luck's motion for summary judgment as to its breach of loyalty claim.  Sitting as the ultimate fact finder, a jury, however, might determine that Luck's employment with AB Mazeikiu Nafta was so insubstantial or damages alleged by Pathfinder were so inconsequential that Luck's conduct did not harm Pathfinder. Similarly, the trier of fact could find that Luck did not act adversely to Pathfinder's interests concerning its relationship with AB Mazeikiu Nafta.

**F.     Corporate Opportunity**

The corporate opportunity doctrine precludes officers and directors from usurping

20

for themselves a business opportunity that the corporation might otherwise have enjoyed. The courts look to whether the corporation is financially able to undertake the opportunity, whether the opportunity is in the line of business of the corporation, and whether there would have been some practical advantage to the corporation in exploiting the opportunity, or whether the corporation has an actual or expectant interest in the opportunity.  See Borden v. Sinskey, 530 F.2d 478, 489-90 (3d Cir. 1976); see also Grotto v. Grotto, 639 A.2d 390 (N.J. Super. Ct. App. Div. 1994) (relying on Guth v. Loft, 5 A.2d 503, 511 (Del. 1939)).  Whether the opportunity meets these criteria is to be judged by the objective facts and circumstances surrounding the situation in which the opportunity came to light. Borden, 530 F.2d at 490.

In Guth, a director deprived his corporation of the opportunity to make a profitable investment and used its funds to seize it for himself.  A trust was impressed on the property acquired and the director was required to account.  Again, drawing all inferences in favor of Pathfinder, there exists a genuine issue of material fact of whether Pathfinder had an expectant interest to a consulting client for whom it was still owed payments. There is a genuine dispute whether Pathfinder was financially able to take on work from AB Mazeikiu Nafta.  Moreover, Luck's employment appears to be in the line of work in which it was previously engaged with AB Mazeikiu Nafta, and arguably Luck would have been better off financially by exploiting this opportunity going in-house with AB Mazeikiu Nafta.  Consequently, Luck's motion will be denied as to Count V because Pathfinder has come forward with sufficient facts, and assumed to be true, that articulate

21

a taking of a corporate opportunity.

## G.    Tortious Interference with a Business Relationship

Luck moves to dismiss Pathfinder's claim of tortious interference with a business relationship because Pathfinder has failed to satisfy the elements of this claim as a matter of law.  Under New Jersey law, the five elements of a claim of tortious interference with a prospective business relationship are:

> (1) a plaintiff's reasonable expectation of economic benefit or advantage,
> (2) the defendant's wrongful, intentional interference with that expectancy;
> (3) in the absence of interference, the reasonable probability that the plaintiff would have received the anticipated economic benefit; and
> (4) damages resulting from the defendant's interference.

Varrallo v. Hammond Inc., 94 F.3d 842, 848 (3d Cir. 1996) (citing Printing Mart-Morristown v. Sharp Elec. Corp., 563 A.2d 31, 37 (N.J. 1989)).[2]  Regarding the second element, courts require facts not only alleging intent, but malice; that is, the harm was inflicted intentionally and without justification or excuse.  See MacDougall v. Weichert, 677 A.2d 162 (1996).  The relevant question becomes whether the defendants conduct was "both injurious and transgressive of generally accepted standards of common morality or of law."  Labus v. Navistar International Transportation Corp., 740 F. Supp. 1053, 1064 (D.N.J. 1990) (quoting Association Group Life, Inc. v. Catholic War

---

[2]  Although the New Jersey courts continue to read Printing Mart, 563 A.2d at 37, as setting out a four-part prima facie case, see, e.g., Platinum Management, Inc. v. Dahms,, 666 A.2d 1028, 1043 (N.J. Super. Ct. Law Div. 1995), several panels of the Third Circuit have read in a fifth element: defendant's knowledge of plaintiff's expected advantage.  See, e.g., Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1167 (3d Cir. 1993).  Whether or not this knowledge constitutes an additional independent requirement, need not be addressed here.

Veterans, 293 A.2d 408, mod. on other grounds, 293 A.2d 382 (N.J. 1972)).

Viewing all the facts and inferences in a light most favorable to Pathfinder, the record here does not establish that a genuine issue of material fact exists as to whether Luck tortiously interfered with a prospective economic advantage owned by Pathfinder. While Luck's actions were arguably in violation of the restrictive covenant, it stops short of being malicious as defined under New Jersey law. In his resignation letter, Luck indicates that his reason for leaving Pathfinder was that he was concerned that the sinking fund was not adequately funded and that his retirement was in jeopardy. (See Pathfinder, Exh. O.) Moreover, Pathfinder's Brief does not make mention of the malice element or the facts sustaining such a claim. Therefore, other motivations, without evidence indicating otherwise, is mere speculation.

The tort of tortious interference requires more than just an expectancy interest in economic benefit, but "the reasonable probability that [Pathfinder] would have received the anticipated economic benefit," but for the interference. Therefore, it is similarly decided here, like in Part III.A, supra, that the Court will not speculate on whether Pathfinder would have ever received economic benefit from AB Mazeikiu Nafta in the future. If anything, the facts indicate that their relationship was steadily deteriorating. Without any evidence suggesting otherwise, such as correspondence or contracts, this probability cannot said to be reasonable as a matter of law. As such, Luck's motion will be granted as to Count VI.

23

## VI.  Conclusion

For the reasons set forth above, Luck's Motion for Summary Judgment will be granted as to Counts III (unjust enrichment) and Count VI (tortious interference with a prospective business relationship).  Luck's Motion for Summary Judgment will be denied as to Count I (breach of contract), Count II (damages, costs, and fees) Count IV (breach of the duty of loyalty), and Count V (corporate opportunity).  The accompanying Order is entered.


/S/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
_____   United States District Judge

DATED: May 20, 2005

24